Jones, Chief Judge,
dissenting:
The basic act creating the Eeconstruction Finance Corporation, as stated in its title, was “To provide emergency financing facilities for financial institutions, to aid in financing agriculture, commerce, and industry, and for other purposes.” (47 Stat. 5)
Section 5 of the same act (47 Stat. 6) clearly shows that its primary purpose was to make loans to institutions in distress and that all other powers were incidental.
In these circumstances the claimant must bring itself squarely within the provision for a deduction allowance by showing an issuance of stock for the purpose of conveying actual ownership to the Government rather than as a means of affording a measure of security for money borrowed from the defendant. This it has not done. Practically all the relevant facts in this case indicate that the note and stock were issued not for the purpose of giving the Government an ownership, but for the purpose of affording the defendant *309 a measure of security for money advanced, the repayment of which obligation would deprive the Government of any indicia of ownership.
The form is not necessarily decisive. It is the substance that governs, just as a mortgage clause at the end of an otherwise complete deed of transfer will make the transaction a secured loan by thus disclosing its purpose.
But here even the form and subsequent operations show a borrowing transaction.
In the instant case the fixed sum, the definite maturity date, the fixed rate of interest, the absence of voting rights, the sinking fund, and other facts and circumstances indicate a debt.
I would hold that the note in question evidenced borrowed invested capital and that the commissioner’s determination was correct.
I would dismiss the petition.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner William E. Day, makes findings of fact as follows:
1. Plaintiff is a corporation organized and operating under the laws of the State of Missouri and engaged in the banking business, with offices at 1119 Walnut Street, Kansas City, Missouri. On June 17, 1949, plaintiff’s name was changed from Mercantile Home Bank and Trust Co., to Mercantile Bank and Trust Co.
2. Plaintiff was organized as a new banking institution to replace four former banks on February 25,1933, eight days in advance of the countrywide bank holiday. Upon termination of the bank holiday, plaintiff promptly reopened, but because of slumping real estate values, and the fact that the bank had substantial real estate mortgages and bonds secured by real estate, plaintiff was in dire need of additional financial assistance.
3. Early in 1934, plaintiff sought $200,000 in financial assistance from the Beconstruction Finance Corporation, which had recently been organized for the purpose of rendering financial aid to banks and other corporations. It *310 was ascertained, however, that banking institutions organized and operated under Missouri banking statutes (section 8008, Missouri Banking Laws; section 362.075, Missouri Revised Statutes, 1929) were required by the constitution of the State of Missouri (article XII, section 10) to obtain approval of all their stockholders in advance of executing any certificates of preferred stock.
4. Article 12, section 10, of the Missouri constitution of 1875 (V. A. M. S. vol. 1, page 266), which section was in force and effect during the calendar years 1933 and 1934, reads as follows:
No corporation shall issue preferred stock without the consent of all the stockholders.
5. Section 1 and section 7 of an act providing for the issuance and sale of shares of preferred stocks by banks adopted by the General Assembly of the State of Missouri and approved by the Governor on April 8, 1933, and thereafter in force and effect through 1934 (Laws, Missouri 1933, pages 406-408), section 1 of which is contained in section 8008, Missouri Banking Laws (section 362.075 V. A. M. S.), provide as follows:
Section 1. May issue and sell preferred stoole shares— /State shall approve. — Notwithstanding any other provision of the laws of this State governing the organization, incorporation, management, and control of corporations, and more particularly the organization, incorporation, management, and control of banks, trust companies doing a banking business, and other financial institutions organized, incorporated, and existing, under the laws of this State and subject to the jurisdiction of, and control by, the Finance Commissioner of the State of Missouri, any such corporation may, with the consent of all its stockholders, issue and sell its shares of preferred stock, of one or more classes, subject to the provisions of this act and the approval of the Finance Commissioner of the State of Missouri. Wherever the term “corporation” is used in this act, it shall be held to mean any trust company doing a banking business or banks in the State of Missouri.
Section 7. Emergency. — There being no adequate law in this State authorizing banks, trust companies, and other corporations, organized, existing and doing a banking business under the laws of this State, to issue *311 and sell preferred stock, and there being an urgent public necessity for such a law, an emergency is declared to exist within the meaning of the constitution, therefore this act shall take effect and be in force from and after the date of its approval by the Governor.
8. Since a considerable number of plaintiff’s stockholders were nonresidents and others were estates in process of administration, it would have been difficult, if not impossible, for plaintiff to obtain the 100 percent required approval of its stockholders in order to issue preferred stock to the Reconstruction Finance Corporation and obtain necessary financial assistance. Because of this situation peculiar to the laws of Missouri, as well as a few other States, the Reconstruction Finance Corporation was permitted, by Congress, to purchase legally issued capital notes or debentures to enable State chartered banks to obtain necessary capitalization through the means of issuing such capital notes or debentures in lieu of preferred stock.
7. By special act of the Missouri legislature the previous year (section 7906, Missouri Banking Laws; section 362.120, Missouri Revised Statutes, 1929), State chartered banks could issue capital notes without obtaining approval of all their stockholders, provided the board of directors authorized such action. Sections 5312, 5313, 5314, and 5315 of article I of chapter 34 of the Revised Statutes of Missouri of 1929, as amended by an act of the General Assembly of the State of Missouri in extra session and approved December 6, 1933 (Laws, Missouri, Extra Session 1933 and 1934, pages 144-147), which was in force and effect throughout the calendar year 1934 and which is contained in substantially the same form in sections 7906, 7907, 7908, and 7909, Missouri Banking Laws (sections 362.120, 362.125, 362.130, and 362.135, V. A. M. S.), provide as follows:
Section 1. Repealing and reenacting certain sections. — That Sections 5312, 5313, 5314 and 5315 of Article I of Chapter 34 entitled, “State Department of Finance,” be and the same are hereby repealed, and four sections enacted in lieu thereof to be known as Sections 5312, 5313, 5314 and 5315, and to read as follows:
Section 5312. Capital notes may be issued and sold by bcmks and trust companies. — Any bank or trust company organized under the laws of this State may, *312 through action of its board of directors and without requiring any action by stockholders, with the written consent of the finance commissioner, issue and. sell at not less than par its capital notes. If, at the time of the issuance of such capital notes the capital of such bank or trust company is impaired, and there shall have been issued and sold capital notes of such bank or trust company in accordance with the provisions of Sections 5312 to 5315 inclusive, in an amount equal to or more than the impairment of the capital of such bank or trust company, as found by the commissioner of finance, then the capital of such bank or trust company shall for all purposes be deemed to be restored and unimpaired. Such capital notes may be sold for cash or, with the written consent and approval of the commissioner of finance, for property and they shall be of a nature specified in, and conform to, the requirements of the several provisions of Sections 5312 to 5315 inclusive.
Section 5313. Capital notes — denominations—rate of interest — maturity—impairment of capital — certain' obligations to be prior claim. — (A) Such capital notes shall be in such denominations and the holders thereof shall be entitled to such annual return thereon not exceeding 6% as the board of directors of such bank or trust company may determine. Such capital notes shall provide that they may be retired at such time or times and in such manner as may be fixed by the board of directors of the bank or trust company, but in no event later than twenty years after the date of their authorization; provided, however, that no bank or trust company shall retire such capital notes if by such retirement an impairment of its capital will be created.
(B) If, at the time of the issuance of such capital notes there exists an impairment of the capital of the bank or trust company issuing the same, and if such impairment of capital exists by reason of the fact, as determined by the commissioner of finance, that certain assets of such bank or trust company are of doubtful value, are uncollectible, or are otherwise objectionable, such assets or portions thereof so determined to be of doubtful value, uncollectible or otherwise objectionable, may, upon issuance of such capital notes, be set apart from the other assets of such bank or trust company and shall thereafter be held by it in trust for the purpose of selling, enforcing, collecting or adjusting the same for the use and benefit of the holders of such capital notes, and., if such assets shall be so set apart, all amounts realized from the sale, enforcement, collection or ad *313 justment of any such assets shall be applied to the ratable retirement of such capital notes and income thereon as provided in Section 5315.
(C) If an impairment of capital exists in whole or in part by reason of the fact, as determined by the commissioner of finance, that certain assets of such bank or trust company have depreciated in value, in that event said bank or trust company may issue to the holders of said capital notes a right of participation to such extent as may be agreed upon in any increase in the value of such assets.
(D) Such capital notes shall at the time of their issuance be, and shall at all times thereafter remain, subordinate in rank and subject to the prior payment of all of the debts and obligations of such bank or trust company except certificates of indebtedness heretofore issued, and such bank or trust company may, for the security and protection of the holders of such capital notes, agree upon such restriction upon the distribution or payment of dividend, on its capital stock as the board of directors may decide. Provided, however, that, subject to the provisions of Section 5376 It. S. 1929 relating to banks, and Section 5447 E. S. 1929 relating to trust companies, such capital notes and accrued return thereon may be retired in whole or in part, with the written approval of the commissioner of finance upon his determining that the proposed retirement of such capital notes will not result in an impairment of the capital of such bank or trust company to any extent whatever, notwithstanding the debts or obligations of such bank or trust company which are senior in rank to, and are entitled to priority of payment over, such capital notes, have not been paid.
Section 5314. Extension of time for retirement of capital notes. — In any case where such capital notes to be issued as provided under the provisions of Sections 5312 to 5315 both inclusive, are made retirable in a period less than 20 years after their authorization, the bank or trust company issuing such capital notes may, by a provision inserted therein to the effect, reserve the right from time to time to extend the time for the retirement of said capital notes and, in such event, the bank or trust company so issuing said capital notes may, by vote of a majority of its board of directors, with the consent of the finance commissioner, make such extension.
Section 5315. Liquidation of assets — funds held in trust. — Upon the assets of any bank or trust company *314 issuing- capital notes being set apart for the use and benefit of the holders of such capital notes, as provided in Section 5313, such bank or trust company shall proceed to collect and liquidate such assets and shall have full authority to sell or enter into any compromise concerning the same. All amounts received or collected by such bank or trust company from the sale, collection or adjustment of such assets and/or from such rights of participation provided for in Section 5313 shall be deposited and kept by it in a separate fund and account, and all such amounts shall be held in trust for the use and benefit of the holders of such capital notes. Whenever such funds so held in trust are equal to 10% of the aggregate amount of the notes then outstanding, such bank or trust company shall distribute and pay such funds to the holders of such capital notes ratably; provided, however, that it shall not be required to make such distribution more often than once in sixty days. In the event the commissioner of finance shall take possession of the business and property of any bank or trust company which has issued any such capital notes, such assets may, upon the request in writing to the commissioner of finance by the holders of the majority in amount of such capital notes, be sold to the highest bidder for cash, and the proceeds thereof shall be paid into the fund above provided for retirement of capital notes; provided, however, that, upon the retirement of such capital notes in full and accruals thereon, any of such assets then remaining undisposed of, or any surplus proceeds of any such sale, shall inure to the benefit of such bank or trust company.
Section 2. Invalidity of section — sections separable.— If any section or provision of this act shall be found invalid, by any court, it shall be conclusively presumed that this act would have been passed by the legislature without such invalid section or provision, and the act as a whole shall not be declared invalid by reason of the fact that one or more sections or provisions may be found to be invalid by any court.
Section 3. Emergency. — That the Congress of the United States recently passed an act authorizing the organization of a Federal corporation known as the Federal Deposit Insurance Corporation, which is authorized to insure on January 1, 1934, certain deposits in banks and trust companies, including all State banks and trust companies of Missouri; that many banks of Missouri may desire to take advantage of the benefits and privileges extended by said Federal Deposit Insurance Cor *315 poration; that the general welfare of the State and the people thereof, will be greatly advanced by having the privileges extended by said Federal Deposit Insurance Corporation open to the banks and trust companies organized under the laws of this State; that such banks and trust companies cannot have all advantages extended by said Federal Corporation without they acquire such advantages under the provisions of this act. It is therefore declared that an emergency now exists affecting the general welfare of the State in that it is necessary to have the privileges extended by said Federal act and Corporation open for the use and benefit of all banks and trust companies organized under the laws of Missouri. It is therefore declared that by reason of the premises an emergency exists within the meaning of the constitution of Missouri and that by reason thereof this act shall take effect and be in force from and after its adoption and approval.
8. On February 15,1934, plaintiff filed its application with the Reconstruction Finance Corporation requesting that the Reconstruction Finance Corporation purchase $200,000 of five percent capital notes, and the same was approved on that date. On February 16, 1934, plaintiff issued its five percent capital note (Special Missouri Form P. S. 2) for $200,000 to the Reconstruction Finance Corporation. This original capital note was revised and substituted by a revised capital note in the principal amount of $200,000, dated February 10, 1936. The material difference between the original capital note and the revised capital note was that the original capital note provided for five percent interest straight through its full term to August 1, 1953, whereas the revised note provided for five percent interest to and including March 31,1934, four percent interest to and including January 31, 1935, three and one-half percent interest to and including January 31, 1940, and four percent interest thereafter until maturity.
The plaintiff, through its officers, knew that the capital note as and when issued was not, at least in form, preferred stock.
9. The revised capital note for $200,000 dated February 10, 1936, was the same capital note that was outstanding in the calendar years 1943,1944, and 1945. Plaintiff furnished the Reconstruction Finance Corporation no security for said re *316 vised capital note. Such revised capital note is in evidence as plaintiff’s exhibit No. 1 and is incorporated herein by reference.
10. When plaintiff was organized in 1933, it issued 2,000 shares of $100 par value common stock for $200 a share, so that its starting capital was $400,000, consisting of $200,-000 in capital stock, $150,000 in surplus, and $50,000 in undivided profits. Upon the payments totaling $6,000 (1939) and at the time each payment was made thereafter on the revised capital note, a comparable amount was added to plaintiff’s account entitled “Reserve for Dividends Payable in Common Stock.” When payments were made in the sum of $100,000 which reduced the balance on the revised capital note, the reserve account had a credit of $100,000, so that the balances of these two accounts remained at $200,000. The balance in the reserve account was then cleared by a capital stock dividend, and the said amount was thereupon transferred to the capital stock account on February 25,1944. Upon the completion of the payment of the revised capital note, the reserve account balance had again accumulated to $100,000, and a second capital stock dividend was declared and paid on February 27, 1945. This increased the capital stock account to $400,000, which was equivalent to the $200,000 original capital stock plus the revised capital note of $200,000. Until the time the first capital stock dividend was paid, the balance on the revised capital note plus the balance of the reserve for dividends payable in common stock remained at $200,000. After the first capital stock dividend, the balance on the revised capital note plus the balance of the reserve for dividends payable in common stock and the amount of capital stock dividends paid always remained at $200,000.
11. From the time of its organization in 1933, down through the calendar years 1943, 1944, and 1945, plaintiff prepared and maintained daily statements reflecting its assets and liabilities. The capital structure of plaintiff on February 15, 1934, the day prior to the date on which it issued its original capital note to the Reconstruction Finance Corporation, as reflected on its daily statement, was as follows:
*317 Capital stock_$200, 000. 00
Surplus_ 150,000.00
Undivided profits_ 49,633.40
The capital structure of the plaintiff on February 16, 1934, the day it issued its original capital note to the Reconstruction Finance Corporation, as reflected on its daily balance sheet, was as follows:
Capital stock_$400, 000.00
Surplus_ 150,000. 00
Undivided profits- 52,684.11
The increase of $200,000 in the capital stock as reflected on this daily statement of February 16, 1934, represented the $200,000 capital note and was included in capital stock because the bank considered it invested capital. The original capital note to the Reconstruction Finance Corporation was still included in capital stock on the daily statements of the plaintiff on December 31, 1934. On the daily statements of the plaintiff dated January 2, 1943, December 30, 1943, December 29, 1944, January 13,1945, and January 15, 1945, the capital note to the Reconstruction Finance Corporation was stated separately from capital stock, but immediately under capital stock and before surplus and undivided profits, i. e., on December 30,1943, the capital structure of the bank, as reflected in its daily statement, was as follows:
Capital stock_$200, 000
Capital note_ 100,000
Surplus_ 200, 000
Undivided profits_ 123, 051
To the knowledge of Mr. Hursig, vice president and comptroller of plaintiff, and chief financial officer of plaintiff from 1938 through the calendar year 1945, said capital note to the Reconstruction Finance Corporation was not reflected on the daily statements of the bank other than as above set forth.
The capital note was always treated on the general ledger of the plaintiff in a separate account titled “Capital Notes” and not in the capital stock account.
12. From the time of its organization in 1933 to the date hi 1940 on which plaintiff joined the Federal Reserve System, it was annually examined by the State of Missouri bank examiners and examiners of the Federal Deposit Insurance *318 Corporation, and thereafter was annually examined by examiners of the Federal Reserve System; and during such period none of the aforementioned examiners ever objected to the bank’s treatment of the capital note as part of its capital structure on its daily balance sheets and general ledger.
13. When plaintiff joined the Federal Reserve System in 1940, it was permitted under the rules and regulations of the Federal Reserve System to consider its capital note outstanding to the Reconstruction Finance Corporation as part of its capital structure for purposes of qualifying for membership with the Federal Reserve System as set forth in the following excerpts from regulation H of the Board of Governors of the Federal Reserve System entitled “Membership of State Banking Institutions in the Federal Reserve System” (effective November 20, 1939, and in effect at the time plaintiff made application for membership) :
Section 1. — DEFINITIONS
For the purposes of this regulation—
$ $ $ $ ‡
(f) The terms “capital” and “capital stock” mean common stock, preferred stock, and legally issued capital notes and debentures purchased by the Reconstruction Finance Corporation which may be considered capital and capital stock for purposes of membership in the Federal Reserve System under the provisions of section 9 of the Federal Reserve Act.
Section 2. — ELIGIBILITY REQUIREMENTS
Under the terms of section 9 of the Federal Reserve Act, as amended, to be eligible for admission to membership in the Federal Reserve System —
(1) A State bank, other than a mutual savings bank, must possess a paid-up, unimpaired[2] capital sufficient to entitle it to become a national banking association in the place where it is situated under the provisions of the National Bank Act, except in the following circumstances, in which case such a bank may be admitted to membership with a lesser capital as indicated:
Section 6. — CONDITIONS OF MEMBERSHIP
(a) Conditions applicable to all institutions applying for membership. — Pursuant to the authority contained *319 in the first paragraph of section 9 of the Federal Reserve Act, which authorizes the Board to permit applying State banks to become members of the Federal Reserve System “subject to the provisions of this Act and to such conditions as it may prescribe pursuant thereto,” the Board, except as hereinafter stated, will prescribe the following conditions of membership for each State bank hereafter applying for admission to the Federal Reserve System, and, in addition, such other conditions as may be considered necessary or advisable in the particular case—
^ ‡ ‡
2. The net capital and surplus funds of such bank shall be adequate in relation to the character and condition of its assets and to its deposit liabilities and other corporate responsibilities,7 and. its capital8 shall not be reduced except with the permission of the Board of Governors of the Federal Reserve System.9
$ $ ‡ $
14. For each of plaintiff’s taxable calendar years 1943, 1944, and 1945, plaintiff filed timely corporate income and excess profits tax returns. On each of said excess profits tax returns plaintiff determined its excess profits credit by the invested capital method. In each of these years plaintiff included in its invested capital credit 100 percent of the outstanding balance of its revised capital note to the Reconstruction Finance Corporation, averaged annually, on the theory that said capital note was invested capital. Likewise, for each of the aforesaid taxable calendar years plaintiff did not include in its excess profits net income any portion of the *320 dividends/interest paid by plaintiff on the revised capital note outstanding.
15. The examining agents of the Bureau of Internal Revenue audited plaintiff’s corporate income and excess profits tax returns for the years 1943, 1944, and 1945, and in separate reports dated December 17, 1946, and April 8, 1948, respectively, determined that plaintiff was liable for a deficiency in excess profits tax for the taxable calendar year 1945 based on the following, among other, determinations:
(a) That the outstanding capital notes of the plaintiff to the Reconstruction Finance Corporation in each of the taxable calendar years 1943, 1944, and 1945, represented borrowed capital and not equity invested capital; therefore only 50 percent thereof could be employed by plaintiff in its determination of its excess profits tax by the invested capital method.
(5) That the amounts paid as dividends/interest upon the aforesaid capital notes represented interest on borrowed capital and not dividends on equity invested capital; therefore plaintiff’s excess profits net income for each of said calendar years should be increased by 50 percent of the amount thereof.
1@. Based upon the foregoing determinations, the exam-ing agents made the following adjustments:
(a) The exclusion from plaintiff’s invested capital for the beginning of each of the calendar years 1943,1944, and 1946, of one-half of plaintiff’s capital note, averaged annually as follows:

Year Amount

1943_$90,158. 90
1944_ 50,000.00
1945- 2,191. 78
thereby reducing plaintiff’s invested capital for the calendar year 1945, and further reducing the carryover of the unused excess profits credit from the calendar years 1943 and 1944 to the calendar year 1945.
(b) By increasing plaintiff’s excess profits net income by one-half the amounts paid by plaintiff as dividends/interest on the capital note outstanding, as follows:

*321
Year Amount

1943_ $3,232.92
1944_ 1,504.11
1945_ 690.41
thereby increasing plaintiff’s excess profits net income for 1945 and reducing the carryover of the unused excess profits credit from the calendar years 1943 and 1944 to the calendar year 1945. The Commissioner of Internal Revenue has approved and adopted the adjustments made by the revenue agents.
17. By reason of the adjustments made by the Internal Revenue agent, as aforesaid, and other adjustments, a deficiency in excess profits tax for the calendar year 1945 was determined and assessed against plaintiff in the sum of $22,502.29 which amount, plus interest thereon, was paid to the collector of internal revenue at Kansas City, Missouri, on July 29,1948. On or about August 30,1948, the plaintiff filed its claim for refund of excess profits tax for the calendar year 1945 in the amount of $14,569.34 with the collector of internal revenue at Kansas City, Missouri. On August 19, 1949, plaintiff received the defendant’s registered notice of disallowance of said claim for refund of excess profits tax for the calendar year 1945 in the amount of $14,569.34.
18. The deficiency in excess profits tax for the calendar year 1945 in the amount of $22,502.29, paid by plaintiff to the collector of internal revenue at Kansas City, Missouri, with interest thereon, was thereafter by him turned over and deposited in the Treasury of the United States in the regular course of business.
19. Plaintiff is the owner of this claim against the defendant and there has been no assignment or transfer of said claim, or of any interest therein by plaintiff.
20. The amount of excess profits tax in dispute in this proceeding is the sum of $5,057.44.
21. In July 1933, Union National Bank in Kansas City, a national bank, issued 90,000 shares of cumulative preferred stock of a par value of fifteen dollars each to the Reconstruction Finance Corporation. As portions of the stock were retired, new certificates were issued for smaller numbers of *322 shares. There is admitted in evidence as plaintiffs exhibit No. 5 that bank’s Preferred Stock Certificate No. 14 dated October 21, 1943 for 50,000 shares issued to the Eeconstruction Finance Corporation. It is incorporated by reference herein. On the face of such certificate it states:
Á description of the Preferred Stock and Common Stock of the Bank and of the preferences, privileges, powers, voting and other rights, restrictions, limitations and qualifications thereof is set forth in the Articles of Association of the Bank and any and all amendments thereto, which are expressly incorporated herein by reference, to all of which the holder hereof by acceptance hereof, agrees and assents.
Such preferences, privileges, powers, etc. are set forth in the Articles of Association of the bank which are in evidence as plaintiff’s exhibit No, 6 and are incorporated by reference herein.
22. The transaction between the plaintiff and the Becon-struction Finance Corporation in the purchase by the latter of the capital note referred to in foregoing findings was in substance a temporary investment by the Beconstruction Finance Corporation in the plaintiff bank as an emergency measure following the bank holiday of 1933.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, together with interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Buie 38 (c) of the Buies of this court.
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due plaintiff, it was ordered May 8, 1957, that judgment for the plaintiff be entered for $5,057.44, plus interest as provided by law.

 Section 345 of the Banking Act of 1935 provides in part that: “If any part of the capital of a national bank, State member bank, or bank applying for membership in the Federal Reserve System consists of preferred stock, the determination of whether or not the capital of such bank is impaired and the amount of such impairment shall be based upon the par value of its stock even though the amount which the holders of such preferred stock shall be entitled to receive in the event of retirement or liquidation shall be in excess of the par value of such preferred stock. If any such bank or trust company shall have outstanding any capital notes or debentures of the type which the Reconstruction Finance Corporation is authorized to purchase pursuant to the provisions of section 304 of the Emergency Banking and Bank Conservation Act, approved March 9, 1933, as amended, the capital of such bank may be deemed to be unimpaired if the sound value of its assets is not less than its total liabilities, including capital stock, but excluding such capital notes or debentures and any obligations of the bank expressly subordinated thereto.”
«This applies to capital stock of all classes and to capital notes and debentures legally issued and purchased by the Reconstruction Finance Corporation which, under the Federal Reserve Aet, are considered as capital for purposes of membership.